Richard Wayne TRAUTMAN, Plaintiff,

v.

BUCK STEBER, INC., et al.,
Defendants.

Civ. A. No. 75–2489.

United States District Court,
E. D. Louisiana.

April 6, 1981.

Harvey J. Lewis, New Orleans, La., for plaintiff.

Thomas L. Jones, Washington, D. C., for defendant U. S.

CASSIBRY, District Judge:

In this damage suit against the United States, the plaintiff Richard Wayne Trautman, a diver employed by Buck Steber, Inc., in the removal of sunken vessels from the Suez Canal, claims that osteonecrosis which necessitated the insertion of a prosthetic device in his shoulder was caused by improper diving procedures on a vessel owned and operated by the United States, and by the medical malpractice of U. S. Navy medical personnel in treating his condition. The matter was tried to the court without a jury and submitted. After considering the law and the evidence, the court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### 1.

Pursuant to a request from the Government of Egypt, the United States agreed to aid that government financially by effecting the removal of certain vessels remaining in the Suez Canal after the so-called 1967 "Six Day War" between Israel and Egypt. Since the Department of State through its Agency for International Development (AID) which would ultimately fund this salvage operation had no experience in contracting for salvage services, it requested and received assistance from the Department of Defense in making contractual arrangements for this operation.

### 2.

Murphy Pacific Marine Salvage Company, Inc., [Murphy], which had previously submitted proposals to the Government of Egypt for the salvage job, was under contract to perform salvage operations for the United States Navy and, accordingly, submitted its bid for this specific job. Murphy was successful and a Task Assignment for this job was issued pursuant to the master contract.

### 3.

Murphy, in turn, received bids from contractors for diving services and subsequently awarded Buck Steber, Inc., [Steber], a subcontract for performing such services. The United States played no part in negotiating or awarding this subcontract.

### 4.

Steber employed the plaintiff, Richard Trautman, as one of the several divers to carry out its subcontract with Murphy.

### 5.

The United States sent a small contingent of naval and civilian personnel (2 civilians, 1 enlisted man, 4 officers at the peak of the operation) to the scene of operations (an area encompassing more than 100 miles) to monitor the contract with Murphy and to provide liaison between Murphy and the Egyptian Government and its personnel when needed. The officer in charge of this contingent was Captain John H. Boyd, Jr.

### 6.

The United States maintained no operational control over Murphy's or Steber's day-to-day operations or their personnel. Diving barges and other small craft owned and operated by personnel of the Suez Canal Authority, an agency of the Egyptian Government, were provided by that government for use by Murphy and Steber. Steber's diving operation was to be conducted in accordance with the provisions of the United States Navy's Diving Manual.

### 7.

While Murphy was carrying out the salvage operation, military personnel, aircraft, vessels and other equipment of several nations were being utilized in the detection and removal of unexploded mines and other ordinance in the Canal which remained from the previous military hostilities between the Israelis and Egyptians. These vessels included two U. S. Navy heavy lift cranes, and other lift crane vessels supplied by a private German concern. United States Navy Explosive Demolition Team (EDT) and Underwater Demolition Team (UDT) personnel were assigned the task of

training Egyptian personnel in the removal of such ordnance.

8.

Accordingly, two or three Navy corpsmen qualified for independent duty and one Navy doctor were sent to the Suez Canal to attend, within their capabilities, to medical needs of these and other U. S. Navy personnel in the area. These medical personnel were also authorized to treat U. S. civilian contractor personnel on a humanitarian "as available" basis.

9.

One of the Navy corpsmen was sent to Port Said at the northern end of the Canal and the doctor and other corpsmen were sent to Ismalia which is approximately at mid-point of the Canal. Murphy Pacific assigned one paramedic in Port Said, and one in Ismalia and one in Suez City at the southern end of the Canal.

10.

The conditions under which these personnel worked and the facilities available were far from ideal. The Suez Canal area, a distance in excess of one hundred miles, remained in many respects a war zone. Until mid-1974 no one lived there and then approximately 250,000 Egyptians were allowed to return to their homes in a matter of weeks. Opposing Israeli and Egyptian combat forces still remained on alert and arrangements for the movement of aircraft during daylight hours had to be made in advance with both Israeli and Egyptian forces. At night the Suez Canal area became a "free fire" zone and aircraft and vessels were not allowed to move.

11.

The corpsman assigned to Port Said worked from his room and a common area in a partially demolished hotel. He had limited medical supplies and equipment which he had brought on short notice from the United States. The same was true of the available supplies and equipment at Ismalia. That facility had only a low-power portable x-ray machine. At both locations power and water were available only during certain times. Sewage and sanitation facilities were sparse and primitive leading to rampant dysentery and other disorders caused by such conditions. While a field hospital was established in the Suez area under Polish auspices, use of these facilities for referral or otherwise were not available to U. S. medical personnel except in "emergency, life threatening" situations.

12.

Plaintiff Richard Trautman, one of the divers employed by Steber completed a course of instruction as a professional diver and had been diving as a professional diver approximately three years prior to his employment by Buck Steber, Inc. Part of his instructions and training as a diver made him knowledgeable in the symptomatology of decompression sickness. Throughout the latter part of 1973 and until his employment in May 1974 by Steber, he had been employed by Epic Divers on a job in the Gulf of Mexico where he was making dives, some to depths of approximately 199 feet. In February of 1974 he sustained a trauma to his right shoulder and it was x-rayed at that time. Only a copy of this x-ray is now in existence and no abnormality is discernible in this print. He was apparently in good health upon commencement of his work for Steber.

13.

Trautman was one in the first group of divers hired by Steber and arrived in Port Said[1] on May 27, 1974. Diving operations by plaintiff and other Steber personnel began on May 29 on the Mecca, one of the sunken wrecks located near the northern end of the canal. Ninety per cent of Trautman's work time until October 1974 was devoted to removing the Mecca. One of the Egyptian vessels provided for use in the project through the efforts of Captain Boyd was made available to Murphy and Steber by the Suez Canal Authority to support diving operations on the Mecca, and was

---

1. At all times pertinent herein, Trautman's dives were made on the wreck Mecca in the Port Said area.

designated Diving Barge # 1 [DB # 1]. Dives utilizing only air life-support systems and ranging in depth from just under the surface to less than 70 feet—not a particularly great depth in professional diving—were required in the performance of diving operations by plaintiff and the other Steber personnel.

14.

Steber and Murphy personnel, as well as transient military personnel, were billeted in the hotel at Port Said and transported by bus to the site where DB # 1, owned by the Suez Canal Authority, was located. Steber personnel made their dives from the barge or from the wreck depending on which was more convenient to them. Either a Murphy Pacific salvage master or a Buck Steber diving supervisor as well as a relief diver and diver tenders were present during all diving operations. A decompression chamber owned by Steber was available for use, if needed, on the barge.

15.

Prior to June 18, 1974, the U. S. Navy Admiral, who was the task force commander and in overall charge of operations, decided to sail down the Suez Canal in his flagship the S/S Barnstable County to Ismalia, Egypt. The U. S. Navy believed it desirable to remove a section from the stern of the sunken Mecca to afford sufficient clearance for this voyage.

16.

Captain Boyd issued to Murphy's representatives a written change order in the Task Assignment for the performance of this particular work, which instructions were a modification of the U. S. Navy's contract with Murphy. The instructions included details as to the portions of the Mecca which were to be removed by the Steber divers. This change resulted in additional work for the small contingent of divers. Its timely completion was essential. Captain Boyd subsequently contacted U. S. Navy officials in Washington and arranged the additional financing necessitated by the change order he issued.

17.

From the outset of the project, unsafe dive practices and improper decompression procedures were committed by Steber on Richard Trautman's dives. These included numerous nonstop excursions to the surface to get burning rods, explosives, etc. which resulted in omitted decompression stops. Plaintiff was also caused to remain on the bottom and/or to make repetitive dives for longer than prescribed periods. Additionally, while working on the stern section of the Mecca, plaintiff was forced to make a nonstop return to the surface to avoid having his air hose severed by an approaching supply vessel.

18.

On June 18, 1974, the diving work on the stern of the Mecca commenced. A three-man dive team, consisting of only two divers and one tender were assigned this chore. Plaintiff was one of the two divers. He had to work 12 hours per day for three or four days making long and repetitive dives, burning and setting explosives. Numerous excursions were made during the dives since the dive crew was shorthanded and the other diver and plaintiff had to do the work of three. There was no standby diver to bring needed equipment down to the divers who were working inside of the ship.

19.

The court finds that plaintiff Trautman received inadequate decompression while working in the Suez Canal Clearance Project, including the portion involving the stern of the Mecca. The unsafe diving practices and inadequate decompression caused plaintiff to suffer chronic, i. e. subacute decompression sickness and ultimately caused plaintiff to develop or aggravated the progression of dysbaric osteonecrosis.

20.

Plaintiff testified that on August 15, after a dive during which he had been "hand jetting", he begain to feel pain in his right shoulder.[2] "Hand jetting" involves strenu-

2. An "Employers First Report of Injury which was completed by plaintiff's fiance who was at

Port Said during the period August 1—September 3, 1974, reported that plaintiff had sus-

ous physical activity in the manipulation and use of heavy equipment under pressure while under water. According to plaintiff the pain persisted and upon completion of a dive on August 31, the pain in his shoulder became so acute that he required assistance reaching the deck of the barge.

### 21.

Plaintiff's supervisor, Alvin Holgerson, an employee of Steber, was on the barge and was made aware of plaintiff's discomfort. Both Holgerson, a former master Navy diver, and plaintiff were well aware by training and experience of the symptomatology of decompression sickness, commonly known as the "bends". At no time did plaintiff or Holgerson consider his shoulder pain as being symptomatic of decompression sickness. If plaintiff had decompression sickness or such was suspected, the proper treatment would have been for plaintiff to have entered the decompression chamber on the barge. Both Holgerson and plaintiff were acquainted with the proper treatment. There was no evidence that the United States had any control of the diving procedure or even had personnel at the site.

### 22.

After indicating his discomfort to Holgerson, Trautman went back to the hotel and saw one of the medical personnel there who gave him a "shot of morphine" and made arrangements for him to travel by helicopter to Ismalia for further medical attention. The court finds that the person he saw was the Murphy paramedic.[3]

### 23.

Upon arrival at Ismalia, plaintiff was seen by a Navy Corpsman and the Navy doctor. He related to them that he believed that he had dislocated his right shoulder while "hand jetting". His shoulder was immobilized and a sling for his arm provided. His shoulder was not x-rayed. He was advised to avoid strenuous activity for ap-

proximately one week and to then return to Ismalia.

### 24.

There was a conflict in plaintiff's testimony as to whether he ever returned to Ismalia after this occasion. Plaintiff testified at trial that he returned in one week, telling the doctor that his shoulder was improved, and that he was then given a slip permitting him to go back to work. However, in his deposition testimony given in 1975, prior to the United States being made a party to this action, plaintiff testified that he had never sought further medical treatment after his one visit to Ismalia. Further, Dr. Cowan, the Navy medical officer, who would have seen Trautman on the second occasion, testified that no slips equivalent to the "fit for duty" slip given merchant seamen at Public Health Hospitals were issued by him or his medical corpsmen.

### 25.

Medical care was made available to contractor and/or subcontractor personnel by the Navy on a humanitarian, "as available" basis as is permitted in 24 U.S.C. § 34. It did not contract to provide medical treatment to these personnel. The Navy medical personnel at both Port Said and Ismalia exercised no control over contractor personnel. They could only make recommendations to these personnel. Likewise, transportation of contractor personnel back to the United States for medical or other reasons was the responsibility of the contractor. The commercial airport at Cairo was approximately one hour away. Evacuation of contractor personnel utilizing med-evac equipment would only be utilized in the case of a known serious illness or injury requiring emergency procedures outside the capabilities available at Ismalia.

---

tained a "partially dislocated right shoulder hand jetting on August 1, 1974."

**3.** According to plaintiff he completed this dive around noon-time and then went to the hotel where he got a "shot of morphine". The Navy corpsman assigned to Port Said at this time never administered morphine to anyone during his tour there. There was a daily helicopter from Port Said to Ismalia which departed approximately 3:00–3:30 p. m. The Murphy paramedic could have made arrangements for his transportation on this flight.

**26.**

After his return to Port Said, plaintiff then went to Cairo for "R&R" (rest and recreation) along with his fiance, another diver and his wife, and to take the two women to the airport for their departure back to the United States. He then returned to Port Said where he acted as radio operator for a few days before returning to diving.

**27.**

Inquiry was made by plaintiff's supervisor, Holgerson, as to the condition of his shoulder prior to allowing his return to diving. Plaintiff stated that his shoulder was no longer bothering him. Further, Holgerson testified that plaintiff did not give him any "fit for duty" slip from the doctor at Ismalia. Plaintiff then continued diving until he departed Egypt for the United States on November 19, 1974. Plaintiff's shoulder suffered further damage and destruction as a result of resuming diving work on the salvage project.

**28.**

After his return to the United States, plaintiff went to an orthopedic surgeon at Huntington Beach, California, for diagnosis and treatment of his shoulder. X-rays were made and evaluated by this doctor and, although these x-rays clearly show a failure of the right humeral head, the difficulty with his shoulder was diagnosed as being caused by calcium buildup or bursitis. He saw this doctor on December 6 or 9, 1974, and on January 3 and February 5, 1975. He was treated with injections of cortisone.

**29.**

Plaintiff took another diver job during late March or early April 1975. Thereafter, on April 25, 1975, he went to see Dr. Horn at his Bone and Joint Clinic, Marrero, Louisiana. X-rays were taken of plaintiff's right shoulder and a diagnosis of "aseptic necrosis of the right humeral head" with "marked cystic and degenerative changes . . ." was made by Dr. Horn.

**30.**

In May 1975, plaintiff was seen by Dr. Beckman of the University of Texas Medical Branch Marine Medicine Clinic for evaluation. The impaction of the humeral head of the right shoulder was confirmed and further x-rays showed no abnormalities in other areas. It was recommended that insertion of a prosthetic device be deferred to take advantage of technical improvements in these devices.

**31.**

"Aseptic necrosis" or, interchangeably, "osteonecrosis", literally means "death of the bone". It results from a loss of blood to the bone. There are approximately 50 known diseases or conditions associated with osteonecrosis but the actual cause of osteonecrosis has not been proven. Among some more commonly known conditions associated with osteonecrosis are trauma, alcoholism, and gout. More recent studies, principally performed in. Great Britain, have shown an association between osteonecrosis and exposure to a hyperbaric environment such as diving. This is sometimes referred to as dysbaric osteonecrosis.

**32.**

Very little was known about dysbaric osteonecrosis within the United States medical profession and particularly in the U. S. Navy Medical Corps in 1974. The first symposium among those doctors from the United States having an interest in the subject was not held until 1972 and their deliberations were not published until 1974. In 1974, the U. S. Navy with the help and supervision of the British Royal Navy began training the first of its doctors, four radiologists, in the radiological diagnosis of dysbaric necrosis. The first survey on the incidence of dysbaric bone necrosis in Navy divers was not completed until 1978.

**33.**

There were four x-rays introduced into evidence by plaintiff. The first was made in February 1974 in connection with the trauma sustained to his right shoulder while employed by Epic Divers. Although only a copy, the right humeral head of plaintiff's shoulder appears to be normal. The next, made in December 1974 in California, shows impaction of the right humeral head. The

third, made by Dr. Horn on April 25, 1975 and those made by the University of Texas Medical Branch at Galveston in May 1975, show progressive impaction from that in the December 1974 film.

### 34.

These films were reviewed by Dr. John Heard, a radiologist employed by plaintiff who was not called to testify and by Dr. John Davidson, a radiologist of great experience in diagnosing dysbaric bone necrosis in the United Kingdom, who testified on behalf of defendant. In addition Dr. Raymond Horn, an orthopedic surgeon, and the doctor who originally diagnosed plaintiff's osteonecrotic condition, examined these x-rays at trial during his testimony on behalf of plaintiff. Doctors Heard, Davidson and Horn agreed in their opinions that the pain experienced by plaintiff on August 15 and August 31, was the result of structural failure and impaction of the humeral head of plaintiff's right shoulder.

### 35.

Dr. Davidson, who has participated in the diagnosis and evaluation of 4,442 British divers as a member of the British Medical Research Council which conducts an ongoing survey of the incidence of dysbaric osteonecrosis in divers, testified that as of April 30, 1980, their studies showed that only 4.4 per cent of the divers were afflicted with osteonecrosis. Of that 4.4 per cent, the minimum time between the first claimed hyperbaric exposure and structural failure was 28 months. The minimum time between the last normal radiograph and structural failure was 21 months. Dr. Davidson further testified that due to the nature of osteonecrosis, particularly in its early stages, there may be a period of several months where there will be no radiographic evidence of osteonecrosis, although present.

### 36.

Dr. Horn, while more experienced in treating osteonecrosis caused by fracture, which develops more rapidly, testified on cross-examination that the shortest time interval between onset of the condition and structural failure that he had seen in his practice was ten months.

### 37.

After considering all of the medical evidence, and recognizing the results shown thus far in the ongoing survey conducted by the British Medical Research Council, the court finds that the time of onset of plaintiff's osteonecrosis is not shown by the evidence. The osteonecrosis could have existed prior to his employment by Steber, but the evidence is not sufficient to show that it did.

### 38.

In April 1977 a prosthetic device was inserted in plaintiff's shoulder by Dr. Miles, an orthopedic surgeon and in November 1978, at the time of his discharge, he was able to "bench press" 100–125 pounds and was doing approximately 20 pushups without discomfort. He was also doing some surfboarding. Plaintiff has been employed as a realtor since that time.

## CONCLUSIONS OF LAW

### 1.

The court has subject matter jurisdiction over this cause and the United States pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741–752.

### 2.

The bases of plaintiff's claim against the United States are threefold. First, that DB # 1 was operated "by or for" the United States within the meaning of Suits In Admiralty Act, 46 U.S.C. § 741, and, accordingly, the United States owed plaintiff a warranty of seaworthiness which was breached. Second, that the United States negligently caused and permitted unsafe diving procedures which resulted in plaintiff's osteonecrotic condition. Third, that the United States had a duty to provide medical care to plaintiff and that the U. S. Navy medical personnel at Ismalia breached the prevailing standard of medical care in their treatment of plaintiff. The plaintiff has failed to carry his burden of proof as to each claim.

### 3.

As to the first claim, the evidence shows that DB # 1 was not "operated by or for" the United States within the meaning of the Suits In Admiralty Act, 46 U.S.C. § 741, and accordingly the United States owed no warranty of seaworthiness to plaintiff. The evidence shows that the United States agreed to assist the Government of Egypt in the removal of ten wrecks from the Suez Canal by contracting with and paying Murphy for the work. DB # 1 was owned by, and its crew was provided by, the Suez Canal Authority, an instrumentality of the Egyptian government for whose benefit the ten wrecks were removed from the Suez Canal. The only connection the United States had with the vessel was to assist through the efforts of Captain Boyd, in having the Suez Canal Authority make the vessel available to Murphy, and its subcontractor Steber, to support diving operations at the Mecca. The United States at no time exercised any authority or control over the use of DB # 1.

### 4.

Plaintiff likewise has failed to carry his burden of proof that the United States caused or permitted unsafe diving practices which resulted in or contributed to plaintiff's osteonecrotic condition. All the evidence showed that the United States exercised no operational control over the work of Murphy or Steber personnel. Plans for the progress of the work in general and for sectioning the wreck Mecca, with which at all times pertinent herein plaintiff's work was associated, were made and provided by Murphy. All dives made by Steber personnel were under the supervision and at the direction of the Steber supervisors and/or the Murphy Pacific salvage masters on board the diving barges.

### 5.

Although unsafe diving practices and procedures occurred during the course of the work in the removal of the wreck Mecca, such practices and procedures were the result of negligence by Steber personnel.

Plaintiff prior to trial settled his claim against Steber. The function of Captain Boyd and the small contingent of U. S. Navy and civilian personnel previously described was to monitor the progress and performance of the work called for in the contract. The United States and its personnel had no duty under its contract with Murphy to determine that safe diving procedures were adhered to or to discover that improper diving practices and procedures were being permitted by Steber.

### 6.

Plaintiff attempted to relate the change in the Task Assignment under the master contract between the United States and Murphy to remove a stern section of the Mecca directly to his osteonecrotic condition by showing the resulting stepped-up performance by the Steber divers and a shortage of work force. Even if such causal relationship existed, there was no evidence presented which would show that Captain Boyd could have reasonably foreseen that this contractual change could or would result in harm or injury to plaintiff.

### 7.

The plaintiff failed to prove that the navy medical personnel committed medical malpractice in this case. Under the circumstances the doctor at Ismalia should not have suspected that because plaintiff was a diver his complaint indicated that he had an osteonecrotic condition which required evacuation from Egypt to other medical facilities for x-ray of his shoulder.

### 8.

The medical treatment afforded plaintiff by the Navy medical personnel was on a humanitarian, "as available basis" as permitted in 24 U.S.C. § 34. The Navy did not hold itself out to plaintiff or other contractor personnel as having medical capability or facilities equal to those found in the United States, nor did the conditions prevailing throughout the Suez Canal at the time permit such capability.

**9.**

Taking into account the circumstances of the onset of plaintiff's pain; the type of medical equipment and facilities available to the Navy medical personnel; the history of receiving a muscle injury while "handjetting" which was given by plaintiff to the Navy medical personnel, and his testimony of reporting to them improvement of his condition upon his return to Ismalia, the treatment provided to plaintiff was reasonable and there was no breach of the prevailing standard of care existent at that place and time in failing to send plaintiff to other facilities for x-ray of his shoulder.

**10.**

Further, given the limited knowledge about dysbaric osteonecrosis in the medical community at large and in the medical corps of the military, it would be pure speculation to conclude that a correct diagnosis of his condition would have been made had he been sent to other facilities outside the area. Support for this conclusion is provided in the fact that the orthopedic surgeon whom plaintiff consulted in California during December 1974 failed to detect his osteonecrotic condition with the use of x-rays under much more favorable circumstances than existed at Ismalia.

**11.**

Finally, the Navy had no duty to transport plaintiff out of the area. If such action had been required, or even requested, the duty was Steber's. According to the evidence Steber would have repatriated him to the United States immediately, at its expense, if Trautman had been dissatisfied with the medical treatment, or had felt that it was inadequate. Instead plaintiff exercised so little responsibility for his health that, notwithstanding persistent pain after returning to work, he chose to say nothing and not to seek further medical evaluation of his condition before completion of his contract on November 19, 1974.

**12.**

A judgment dismissing the complaint of plaintiff Richard Wayne Trautman against the United States of America with prejudice and costs shall be entered by the clerk.